**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| JOHN SOLAK, Individually And On Behalf Of All Others Similarly Situated,<br><br>　　　　　　Plaintiff,<br><br>　　　v.<br><br>JOSEPH E. CONSOLINO, RONALD J. BRICHLER, I. JOHN CHOLNOKY, PATRICK J. DENZER, GARY J. GRUBER, DONALD D. LARSON, TONY J. MERCURIO, DAVID W. MICHELSON, NORMAN L. ROSENTHAL, DONALD W. SCHWEGMAN, ALAN R. SPACHMAN, NATIONAL INTERSTATE CORP., GREAT AMERICAN INSURANCE COMPANY, AMERICAN FINANCIAL GROUP, INC., and GAIC ALLOY, INC.,<br><br>　　　　　　Defendants.<br>　　-and-<br><br>NATIONAL INTERSTATE CORP., an Ohio corporation,<br><br>　　　　　　Nominal Defendant. | Case No. 5:16-CV-02470<br><br>**Judge**<br><br>**CLASS AND DERIVATIVE ACTION**<br><br>**VERIFIED SHAREHOLDER CLASS AND DERIVATIVE ACTION COMPLAINT BASED UPON SELF-DEALING, BREACH OF FIDUCIARY DUTY, AND VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY DEMAND** |

John Solak ("Plaintiff"), by and through his attorneys, alleges upon information and belief, except for his own acts, which are alleged upon personal knowledge, as follows:

**SUMMARY OF THE ACTION**

1.　　This is both a derivative and direct stockholder class action brought by Plaintiff on behalf of the Company and holders of the common stock of National Interstate Corp. ("National Interstate" or the "Company") other than Defendants (defined below), against Defendants for their violations of Sections 13(e), 14(a) and 20(a) of the Securities Exchange Act

of 1934 (the "Exchange Act") and rules and regulations promulgated thereunder, including Rule 14a-9 and Rule 13e-3.  Plaintiff also asserts claims against the members of National Interstate's board of directors (the "Individual Defendants" or "Board") and Great American Insurance Company ("Great American") for breaches of fiduciary duty in connection with the proposed acquisition of National Interstate by Great American through a merger transaction, as detailed herein (the "Proposed Transaction").

2.      On July 25, 2016, National Interstate and Great American jointly announced that they had reached a definitive Agreement and Plan of Merger ("Merger Agreement") whereby Great American, a wholly-owned subsidiary of American Financial Group, Inc. ("AFGI"), will acquire the approximately 49% of National Interstate's issued and outstanding common shares that it does not presently own.  The Proposed Transaction was unanimously approved and adopted by the members of the board of directors of National Interstate, except those members who are affiliated with Great American or AFGI.  Upon the closing of the Proposed Transaction, National Interstate will become a wholly-owned subsidiary of AFGI.  Pursuant to the Merger Agreement, National Interstate common stockholders will have their shares cancelled and automatically converted into the right to receive $32.00 in cash, plus a dividend of $0.50 per share (the "Merger Consideration").  The total value of the Proposed Transaction is $660 million.

3.      Defendants violated the above-referenced sections of the Exchange Act, and rules and regulations promulgated by the U.S. Securities and Exchange Commission ("SEC"), by filing a materially incomplete and misleading Schedule 14A Preliminary Proxy Statement with the SEC on August 16, 2016, which was later revised on September 20, 2016 (the "Proxy").  The Proxy recommends that National Interstate stockholders exchange their shares pursuant to the terms of the Merger Agreement, based, among other things, on the opinion rendered by the

Special Committee's (defined below) financial advisor, Morgan Stanley & Co. LLC ("Morgan Stanley") and other internal and external factors the National Interstate Board purportedly considered in making the recommendation.

4.      National Interstate's Board is controlled by Great American, the Company's majority shareholder, and by Great American's parent Company, AFGI.  Great American owes independent fiduciary duties to Plaintiff and the Class as a controlling stockholder of National Interstate.  A majority of the Board consists of senior officers of either Great American or AFGI, or former and current Presidents and Chief Executive Officers ("CEO") of the Company.  These conflicted directors breached their fiduciary duty of loyalty to the Company's shareholders by facilitating Great American's and AFGI's efforts to acquire the Company for a bargain.  The Merger Agreement also contains a provision requiring the immediate vesting and cashing out of all the outstanding equity owned by the Company's directors and officers upon consummation of the Proposed Transaction.

5.      Further, the Board failed to give the special committee, made up of those directors that are not also employed by Great American or AFGI (the "Special Committee"), clear authority to negotiate and to consider all available alternatives to the Proposed Transaction, and the Special Committee failed to insist on the right to look at alternatives, to conduct a pre-agreement market check, and ultimately gave up its negotiating leverage.

6.      The final offer of $32.00 plus the $0.50 dividend payment was conditioned on Defendant Alan R. Spachman's ("Spachman") agreement to vote his shares in favor of the deal, which represents 9.7% of the outstanding common shares of the Company.

7.      Not only was the forced sales process for the Company fundamentally flawed, but the agreed upon Merger Consideration is inadequate.  The Defendants have urged the

Company's minority shareholders to cash-out their shares and forego benefitting from the Company's future profitability and dividend payouts.  The Company has consistently announced positive financial results in recent quarters.  Indeed, for the second quarter 2016, the Company reported net income per share of $0.45, compared to $0.33 for the same period in 2015, and $0.80 for the first six months of 2016, compared to $0.69 the previous year.  Net income for both periods reflects improved underwriting results which were offset by expenses related to the Proposed Transaction.

8.      In order to lock up the Proposed Transaction in favor of Great American, the Board included various preclusive and onerous deal protection provisions in the Merger Agreement, including: (i) a strict "no-solicitation" provision that prohibits the Company from soliciting other potential acquirers or from continuing ongoing discussions with potential acquirers; (ii) a five-day matching rights period during which Great American can match any superior proposal received by the Company; and (iii) a provision that requires the Company to pay Great American a "termination fee" of $13,500,000 in cash plus $3,950,000 in expenses in order to enter in a transaction with a superior bidder.  These provisions unreasonably inhibit the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives.

9.      In addition to the accelerated vesting of their equity holdings, National Interstate insiders and officers will either be retained by the surviving entity and/or receive cash severance payments under the Company's change in control agreements.

10.      In pursuing the plan to facilitate Great American's acquisition of National Interstate for grossly inadequate consideration, through a flawed process, the Defendants violated Sections 14(a) and 20(a) of the Exchange Act, and regulations thereunder, by causing

the materially incomplete and misleading Proxy to be filed with the SEC and thereby disseminated to the Company's stockholders.  The Proxy recommends that National Interstate public stockholders vote in favor of the Proposed Transaction based on misleading information and without disclosing all material information, which renders the Proxy misleading.

11.     Specifically, the Proxy contains materially incomplete and misleading information concerning (i) the background of the Proposed Transaction; and (ii) the financial analyses of the Proposed Transaction performed by Morgan Stanley.

12.     For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages under the claims asserted herein.

## JURISDICTION AND VENUE

13.     Pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act, this Court has jurisdiction over the claims asserted herein for violations of Sections 13(e), 14(a) and 20(a) of the Exchange Act and SEC Rules 14a-9 and 13e-3 promulgated thereunder.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

14.     The Court has personal jurisdiction over Defendants because each is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

15.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because Plaintiff's claims arose in this District, where most of the actionable conduct took place, where most of the documents are electronically stored, and where the evidence exists.  National Interstate is incorporated in Ohio and is headquartered in Richfield, which is within this District.  Moreover,

each of the Individual Defendants, as Company officers and/or directors, has extensive contacts within this District.

## THE PARTIES

16.     Plaintiff is, and at all relevant times was, a stockholder of Defendant National Interstate since prior to the wrongs complained of herein.

17.     National Interstate is a corporation organized and existing under the laws of Ohio, with its principal executive offices located at 3250 Interstate Drive, Richfield, Ohio 44286.  The Company and its subsidiaries operate as an insurance holding company that underwrites and sells traditional and alternative property and casualty insurance products to the passenger transportation, trucking and moving and storage industries, general commercial insurance to small businesses in Hawaii and Alaska, and personal insurance to owners of recreational vehicles throughout the United States.  The Company went public in 2012 and since then has traded on the NASDAQ Stock Exchange under the symbol "NATL."

18.     Defendant Anthony J. Mercurio has served as the Company's President since November 2015 and became the CEO on May 5, 2016, succeeding Defendant David W. Michelson ("Michelson").

19.     Defendant Joseph E. Consolino ("Consolino") has been a director of National Interstate since 2006 and has been the Chairman of the Board since February 15, 2013. Consolino has also served as the executive vice president of AFGI since February 16, 2013, and since March 1, 2013, he has served as the Chief Financial Officer ("CFO") of AFGI.  Consolino also serves on the Board of AFGI.

20.     Defendant Ronald J. Brichler ("Brichler") has been a director of National Interstate since 2010.  Brichler has been employed by AFGI since 1976 and is currently the executive vice president of AFGI.

21.     Defendant I. John Cholnoky ("Cholnoky") has been a director of National Interstate since March 2015.  Cholnoky is a member of the Special Committee.

22.     Defendant Patrick J. Denzer ("Denzer") has been a director of National Interstate since 2014.  Denzer is a member of the Special Committee.

23.     Defendant Gary J. Gruber ("Gruber") has been a National Interstate director since 1991.  Gruber also serves as executive vice president of Great American and has held a variety of positions at Great American since 1977.  Gruber has also served on the Board of Great American since 1993.

24.     Defendant Donald D. Larson ("Larson") has been a director since 1991.  Larson is also the President and Chief Operating Officer ("COO") of Great American Property & Casualty Insurance Group, a specialty group within Great American, and formerly the executive vice president and president at that company.  Larson joined AFGI in 1973 and Great American in 1981 and has served as a director of Great American since 1988.  Larson served as the Chairman of the Company's Board from 1993 until 2004.

25.     Defendant Michelson was the Company's President and CEO from January 2008 until May 5, 2016, when he was succeeded by Mercurio.  Michelson joined the Company in 1992, holding various positions, including President and COO in 2007.

26.     Defendant Norman L. Rosenthal ("Rosenthal") has been a director of National Interstate since 2014.  Previously, Rosenthal was employed by Morgan Stanley for 15 years in the firm's property and casualty insurance industry group.  Rosenthal is a member of the Special Committee.

27.     Defendant Donald W. Schwegman ("Schwegman") has been a director of National Interstate since 2014.  Schwegman is a member of the Special Committee.

28.     Defendant Spachman is the founder of the Company and served as the Company's Chairman of the Board from 2004 through 2013.  Spachman was also the CEO from the Company's inception in 1989 through 2007.  Spachman is a member of the Special Committee.

29.     Defendants above are collectively referred to hereinafter as the "Individual Defendants" or the "Board."

30.     Each of the Individual Defendants herein is sued individually, and as an aider and abettor, as well as in his or her capacity as an officer and/or director of the Company, and the liability of each arises from the fact that he or she has engaged in all or part of the unlawful acts, plans, schemes, or transactions complained of herein.

31.     Defendant Great American Insurance is an Ohio corporation headquartered in Cincinnati that engages primarily in property and casualty insurance, focusing on specialized commercial products for businesses, and in the sale of traditional fixed and fixed-indexed annuities.

32.     Defendants GAIC Alloy, Inc. ("Merger Sub") is an Ohio corporation and wholly-owned subsidiary of Great American Insurance, and was formed for purposes of effectuating the Proposed Transaction.

33.     Defendant AFGI is an Ohio corporation headquartered in Cincinnati that provides multi-line property and casualty insurance.  AFGI is the parent corporation of Great American Insurance.

34.     Collectively, the Individual Defendants, National Interstate, Great American, AFGI, and Merger Sub are referred to herein as the "Defendants."

## CLASS ACTION ALLEGATIONS

35.     Plaintiff brings this action on his own behalf and as a class action pursuant to rule 23 of the Federal Rules of Civil Procedure, on behalf of all holders of National Interstate

common stock who are holders of record and entitled to vote on the Proposed Transaction and are being and will be harmed by Defendants' actions described below (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation or other entity related to or affiliated with any of the Defendants.

36. This action is properly maintainable as a class action because:

(a) The Class is so numerous that joinder of all members is impracticable. As of August 1, 2016 there were approximately 19,927,191 shares of National Interstate common stock issued and outstanding. Class members are believed to be geographically dispersed.

(b) Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class. Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class;

(c) The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class;

(d) To the extent Defendants take further steps to effectuate the Proposed Transaction, preliminary and final injunctive relief on behalf of the Class as a whole will be entirely appropriate because Defendants have acted, or refused to act, on grounds generally applicable and causing injury to the Class.

37.     There are questions of law and fact that are common to the Class and that predominate over questions affecting any individual Class member, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  The common questions include, *inter alia*, the following:

(a)     Whether Defendants have violated Section 14(a) of the Exchange Act, Rule 14a-9, or other SEC rules regarding the disclosure of material information to Company stockholders;

(b)     Whether the Individual Defendants have violated Section 20(a) of the Exchange Act;

(c)     Whether the Individual Defendants breached their fiduciary duties;

(d)     Whether Great American and/or GAIC Alloy, Inc. breached its fiduciary duties as controlling stockholders of the Company; and

(e)     Whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Transaction consummated as presently anticipated.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

38.     Plaintiff also brings this action derivatively in the right and for the benefit of National Interstate to redress injuries suffered, and to be suffered, by the Company as a direct result of the breaches of fiduciary duty, violations of the Exchange Act, and the aiding and abetting thereof, by Defendants.

39.     Plaintiff will adequately and fairly represent the interests of National Interstate and its shareholders in enforcing and prosecuting its rights.

40.     Plaintiff is and was an owner of the stock of National Interstate during all times relevant to the misconduct by Defendants as alleged herein.

41.     Plaintiff has not made a demand on the Board to file suit for the breaches of fiduciary duty and violations of the Exchange Act alleged herein because such a demand would be a futile and useless act, particularly because:

(a)     All of the directors on the Board are alleged to have committed violations of federal law and/or breaches of their fiduciary duties for which they are accountable to the Company and to the Company's shareholders;

(b)     All of the members of the Board knew of and/or will directly benefit from the wrongdoing complained of herein, including receiving vested and unvested equity holdings and golden parachute compensation if and only if the Proposed Transaction is consummated;

(c)     All of the directors on the Board are named as wrongdoers and Defendants in this lawsuit;

(d)     Each Individual Defendant was in the possession of non-public information regarding the Proposed Transaction and the material omissions and misleading disclosures at issue in this litigation;

(e)     Each Individual Defendant reviewed the Proxy before it was disseminated, and approved the dissemination thereof;

(f)     Each Individual Defendant was responsible for the disclosures and omissions in the Proxy;

(g)     Each Individual Defendant recommended that the Company's shareholders vote in favor of the unfair Proposed Transaction in the Proxy;

(h)     Each Individual Defendant violated the individual rights of the Company's shareholders to make a fully informed vote on the Proposed Transaction by disseminating a flawed Proxy;

(i)     In order to bring this suit, all of the directors of National Interstate would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

(j)     The acts complained of constitute violations of federal law and/or breaches of the fiduciary duties owed by National Interstate officers and directors and these acts are incapable of ratification;

(k)     Any suit by the directors of National Interstate to remedy these wrongs would likely expose the Individual Defendants and National Interstate to further civil actions being filed against one or more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves;

(l)     Each member of the Board is, directly or indirectly, the recipient of remuneration paid by the Company, including benefits, stock options, and other emoluments by virtue of their Board membership and control over the Company, the continuation of which is dependent upon their cooperation with the other members of the Board, and their participation and acquiescence in the wrongdoing set forth herein and they are therefore incapable of exercising independent objective judgment in deciding whether to bring this action;

(m)     Due to their association as directors of the Company and/or their positions as present or former employees, the directors are dominated and controlled so as not to be capable of exercising independent objective judgment; and

(n)     National Interstate's current and past officers and directors are protected by directors and officers' liability insurance against personal liability for their breaches of fiduciary duty alleged in this Complaint, which they caused the Company to purchase for their protection with corporate funds, i.e., monies belonging to the shareholders of National Interstate. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the Defendants in this case contain provisions which eliminate coverage for any action brought directly by National Interstate against these Defendants, known as, among other things, the "insured versus insured exclusion."  As a result, if these directors were to sue themselves or certain of the officers of National Interstate, there would be no directors and officers' insurance protection and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and may provide a basis for the Company to effectuate recovery.  If there is no coverage pursuant to directors and officers' liability insurance, the defendant directors will not cause National Interstate to sue them, since they will face a large uninsured liability.

42.     Plaintiff has not made any demand on National Interstate shareholders to institute this action since such demand would be futile and useless action for the following reasons:

(a)     National Interstate is a publicly traded company with nearly 20 million shares outstanding, beneficially owned by thousands of shareholders;

(b)     Making demand on such a number of shareholders would be impossible for Plaintiff who has no way of finding out their names, addresses, or phone numbers; and

(c)     Even if all shareholders could be individually identified, making demand on all shareholders would force Plaintiff to incur enormous expenses.

## SUBSTANTIVE ALLEGATIONS

**A.**      **Background**

43.      National Interstate Corporation and its subsidiaries operate as an insurance holding company that underwrites and sells traditional and alternative property and casualty insurance products primarily to the passenger transportation, trucking and moving and storage industries, general commercial insurance to small businesses in Hawaii and Alaska and personal insurance to owners of recreational vehicles and commercial vehicles throughout the United States. The Company offers approximately 40 product lines in the specialty property and casualty insurance market, which it groups into four general business components (alternative risk transfer (ART), transportation, specialty personal lines and Hawaii and Alaska) based on the class of business, insureds' risk participation or geographic location.

44.      The Company's share price performance of 21.90% over the last twelve months is above the peer median of 14.36%, which indicates the Company is a leading performer relative to its peers.

45.      In 1990, Great American acquired a majority ownership in the Company, which it still holds. Great American's parent company, AFGI, with a roughly 51% stake in National Interstate, in February 2014 also had offered $30 a share for the remaining minority stake in the Company.  However, that offer was withdrawn after a judge signaled he would block the deal, and parties to a lawsuit over it were unable to resolve their differences.

**B.**      **The Proposed Transaction and the Flawed "Process"**

46.      On July 25, 2016, National Interstate issued a press release announcing the Proposed Transaction.

14

47.     The process that led to the Proposed Transaction was flawed from the beginning. Indeed, there was not a process at all – the Special Committee, with authority delegated by the conflicted directors, negotiated solely and exclusively with Great American.

48.     The Proxy describes a fundamentally flawed process in which the Board failed to contact any other entity about the sale of the Company and engaged only with Great American. The Board authorized the filing of the false and misleading Proxy to obscure and obfuscate its actions and inactions, to obtain the requisite shareholder vote to accomplish the takeover of the Company.

49.     After launching an unsuccessful tender offer in 2014 to acquire the Company for $28 per share, deemed coercive by this Court, AFGI and Great American renewed an attempt in March 2016 to squeeze out the minority shareholders of the Company.

50.     On March 6, 2016, the board of Great American met and approved a proposal for AFGI to acquire all of the outstanding common shares not already owned by Great American for $30 per share.  The board of Great American also determined that formation of the Special Committee and shareholder vote would be necessary, to avoid another judicial rejection of a takeover.

51.     The conflicted director Consolino was chosen to represent AFGI and Great American in negotiating the Proposed Transaction with the Company.  Consolino is the Chairman of the Company Board and also the executive vice president, CFO, and board member of AFGI. Consolino communicated to the directors who were purportedly unaffiliated with AFGI or Great American (the "Unaffiliated Directors") that a proposal was forthcoming, in the form of a letter proposing to acquire the Company for $30 per share, which was delivered to the Board the evening of March 6, 2016.

15

52.     The Unaffiliated Directors decided to retain Wilkie Farr & Gallagher LLP as legal counsel to the Special Committee, and subsequently, decided to include all Unaffiliated Directors on the Special Committee.

53.     The whole Board met on April 6, 2016 and adopted resolutions concerning the scope of the Special Committee's authority.  The Special Committee was delegated the power and authority to:

(1) make such investigation of the Proposed Transaction as the Special Committee deemed appropriate;

(2) consider and recommend to the Board whether or not it would be in the best interests of the Company and the holders of the common shares of the Company to proceed with the Proposed Transaction and/or to engage in discussions and/or negotiations with respect thereto;

(3) negotiate with AFGI and Great American any element of the Proposed Transaction;

(4) consult with and/or advise management, on behalf of the Board, in connection with discussions and/or negotiations concerning potential terms and conditions of the Proposed Transaction;

(5) consider such other matters as may be requested by the Board from time to time;

(6) make any recommendations to the Board concerning the Proposed Transaction that the special committee deemed appropriate, including recommendations with respect to any matters requested by the Board; and

(7) determine to elect not to pursue the Proposed Transaction.

Proxy at 24.

54.     The Special Committee however, was not given clear authority to contact other possible bidders for a market check, foreclosing the possibility of a higher bid for the Company from either a strategic or financial buyer.  Although the Special Committee appears to have considered other bidders based on materials prepared by Morgan Stanley, it is clear that the Special Committee did not instruct Morgan Stanley to do a full and real auction process to maximize shareholder value.

55.     "Negotiations" commenced between the Special Committee and Consolino on behalf of Great American, and Morgan Stanley began a financial analysis of a possible transaction with Great American.  Consolino was periodically updated by Arthur J. Gonzales, the Senior Vice President, General Counsel and Secretary of the Company ("Gonzalez") regarding the potential transaction.  Specifically, on May 12, 2016, Gonzales provided an update to Consolino about the process and timing of the Proposed Transaction, and summarized requests Morgan Stanley made to Company management relating to the Company's outlook and other financial information, which were topics for discussion at the meeting between the Special Committee and Morgan Stanley scheduled for the next day. Consolino also had access to management information, including the analysis of Duff & Phelps, the financial advisor for National Interstate, during the 2014 tender offer by AFGI. Duff & Phelps considered this to be highly inappropriate and ended its participation in the process. AFGI and Great American have therefore, continued to take advantage of highly material inside information obtained from the conflicted directors.

56.     On May 26, 2016, Morgan Stanley presented its preliminary financial analysis to the Special Committee, which included potential strategic alternatives to the Proposed Transaction, *i.e.*, sale of the Company to a third party financial or strategic buyer, and areas of

potential additional value and synergies that Morgan Stanley had identified.  It is unclear whether the Special Committee discussed the possibility of conducting an auction for the Company.  However, the Special Committee directed Morgan Stanley to make a presentation to Great American regarding the additional value and synergies because it felt that would be a "negotiating tactic."  Proxy at 26.

57.     Morgan Stanley made the presentation to Consolino on June 2, 2016, including areas of potential additional value and synergies as potential drivers for value, and its initial views as to potential ranges of values for the Proposed Transaction.  The Proxy does not disclose what the potential ranges are, but subsequent to this meeting, on June 24, 2016, Great American and AFGI decided to increase its offer for the Company from $30 per share to $30.75 per share. While an eager National Interstate shareholder could theoretically obtain some information about the synergies considered by Morgan Stanley by accessing the SEC's Edgar database and scouring the various Morgan Stanley presentations attached to the 13E3/A Great American filed with the SEC on September 20, 2016, shareholders are not required to look beyond a proxy statement to uncover material information.  That an investor could hypothetically conduct research to clarify ambiguities and discover omissions in the proxy statement does not relieve the Board of its fiduciary duties and obligations under the federal securities laws.  Shareholders are entitled to a candid disclosure of all material facts and are not be required to ask a series of detailed questions to elicit the material fact.  Further, the "total mix" of information does not encompass the total universe of information available in the public domain.  Indeed, a reasonable investor is not required to pore through SEC filings.

58.     The Special Committee met and quickly decided to reject the June 24 offer three days later. The Special Committee discussed maintaining the Company as a stand-alone entity or

18

negotiating further with Great American.  However, it did not raise the possibility of a market check, even as a negotiating tactic.

59.     On July 1, 2016, Morgan Stanley met with Consolino to discuss the rejection of the revised proposal, and Consolino demanded to speak to Rosenthal, the Chairman of the Special Committee directly, and expressed that AFGI may consider an increase in the sale price. Both Rosenthal and Consolino stated that they each believed certain shareholders of the Company support rejecting and accepting the revised $30.75 proposal, respectively.

60.     On July 5, 2016, AFGI's Board met telephonically and authorized Consolino to propose an increase in AFGI's offer for the Company to $32.00 per share.  The next day, Consolino delivered a letter containing the $32.00 proposal to Morgan Stanley as AFGI's best and final offer, followed by a press release announcing the same.  Certain unidentified members of the Special Committee deemed the $32.00 proposal insufficient, but the Proxy fails to specify why such members deemed the price insufficient.

61.     The $32 proposal came at a time when the Company was on the brink of announcing second quarter 2016 results.  Defendant Mercurio indicated to the Special Committee and Morgan Stanley, during a meeting discussing the new proposal, that he expected the Company to meet or nearly meet the financial targets for the quarter according to the Company's internal projections.  The Special Committee resolved not to vote on the new proposal pending second quarter results.  According to the Proxy, Morgan Stanley received input from certain shareholders of the Company.  However, the Proxy does not indicate what those shareholders' views were.

62.     On July 15, 2016, Morgan Stanley had a telephone conversation with Julie A. McGraw ("McGraw"), the Company's Vice President and Chief Financial Officer ("CFO")

regarding the Proposed Transaction and the pending second quarter results.  McGraw informed Morgan Stanley that certain revisions had been made to the Company's projected financial results with respect to the Proposed Transaction which would decrease value accretion to the Company's business.  The Special Committee decided to have Morgan Stanley conduct a revised valuation analysis in light of the revisions to the projected financial results.

63.     On July 20, 2016, the Special Committee and Morgan Stanley met and discussed the pending second quarter results as well as Morgan Stanley's revised financial analysis, which no longer reflected material value accretion from the Proposed Transaction.  The Special Committee decided to communicate to Consolino that the Special Committee would likely support the $32 proposal, or would definitely unanimously support a proposal of $32.50.  The Proxy fails to specify why the members of the Special Committee who deemed the $32 price inadequate were willing to support a deal for a mere $0.50 more, or 1.5% increase in the offer price.  Apparently, the members of the Special Committee felt confined to accept the fact that a deal with Great American was imminent and mandatory, regardless of the inadequacy of the price to the Company's minority shareholders.  They thus agreed to approve a deal for a few cents more, rather than pursuing a deal with another suitor for fair value.  Spachman was also prepared to sign a voting agreement to vote his shares to support the Proposal Transaction at that price.

64.     Consolino and Carl H. Lindner III, Co-CEO, Co-President and Director of AFGI responded by stating that AFGI would consider allowing the Company to issue a special dividend of $0.50 per share to all shareholders immediately prior to the closing of the Merger if the Special Committee was prepared to unanimously approve the Proposed Transaction at the current offer price of $32 per share, with Spachman agreeing to a voting agreement.

65.     On July 21, 2016, the Special Committee met and resolved to instruct Morgan Stanley to use the Company's 2016-2018 projections as the basis for its financial analysis of the final proposal, and to proceed to negotiate the Proposed Transaction based on the final proposal.

66.     Thereafter, the parties finalized the terms of the Merger Agreement, after what appears to have been some mild back-and-forth negotiations for three days, agreeing to final merger consideration of $32 per share plus a $.050 dividend.

67.     On July 24, 2016, the Special Committee recommended that the Board approve the Merger Agreement.  No effort appears to have been made during these final negotiations to seek a "go-shop" clause in the Merger Agreement to allow National Interstate to engage in a limited market check.  The entire Board then proceeded to consider the approval of the Proposed Transaction, and the Special Committee, along with Mercurio and Michelson, approved the deal. The rest of the Board, although present, recused themselves from the approval. Proxy at 32.

68.     The coercive nature of this squeeze-out merger is illustrated by the fact that the Proxy cites AFGI's *refusal to consider voting in favor of any alternative transaction* as a reason the Special Committee decided to agree to the Proposed Transaction.  Proxy at 35.

**C.**     **The Proposed Transaction Undervalues National Interstate Shares**

69.     The Merger Consideration offered to National Interstate's public stockholders in the Proposed Transaction is unfair and grossly inadequate because, among other things, the intrinsic value of the Company's common stock is materially in excess of the amount offered for those securities in the proposed acquisition given the Company's prospects for future growth and earnings.  Indeed, one of Morgan Stanley's valuation presentations indicates that the Company is worth up to $45.86 per share.  The Proposed Transaction will deny Class members their right to

fully share equitably in the true value of the Company.  The benefits obtained by Great American through the Proposed Transaction outweigh those provided by the Merger Consideration.

70.    As noted above, for the last several earnings results reports, the Company had reported positive results and growth trends and had beaten Wall Street estimates.

71.    Thus, on August 2, 2016, the Company released its 2016 second quarter results. The Company reported net income per share of $0.45, increased from $0.33 for the same period in 2015; net investment income of $10.8 million for the quarter was ahead of the same period last year, reflecting an increase in average cash and invested assets.

72.    Individual Defendant Mercurio stated in the press release announcing the results:

> Underwriting results further improved in the 2016 second quarter which contributed to a strong first six months of the year. We are certainly pleased and encouraged by these first half results, but also recognize that we have more work ahead of us to further improve our underwriting results.

### D.    The Preclusive Deal Protection Devices

73.    Despite National Interstate's strong prospects for future profitability and growth, Defendants targeted the sale of the Company solely to Great American and agreed to onerous deal provisions and other agreements to ensure a sale to Great American.  These preclusive deal protection devices operate conjunctively to make the Proposed Transaction a *fait accompli* and ensure that no competing offers will emerge for the Company.

74.    The Merger Agreement contains a strict "no shop" provision prohibiting the Board from taking any affirmative action to comply with their fiduciary duties to maximize stockholder value, including soliciting alternative acquisition proposals or business combinations.  The Merger Agreement also includes a strict "standstill" provision which prohibits, except under extremely limited circumstances, the Defendants from even engaging in discussions or negotiations relating to proposals regarding alternative business combinations.

75.     Specifically, Section 5.4(a) of the Merger Agreement includes a "no solicitation" provision barring the Board and any Company personnel from soliciting, initiating, facilitating or encouraging alternative proposals in an attempt to procure a price in excess of the amount offered by Great American.  The Company also must terminate any and all prior or existing discussions with other potential suitors.

76.     Additionally, Section 5.4(b), (c), and (e) of the Merger Agreement grants Great American recurring and unlimited matching rights, which provides it with: (i) unfettered access to confidential, non-public information about competing proposals from third parties which it can use to prepare a matching bid; and (ii) five (5) business days to negotiate with National Interstate to amend the terms of the Merger Agreement and make a counter-offer in the event a superior offer is received.  Section 5.4(c) requires the Company to notify Great American within 24 hours if it receives an inquiry, proposal or offer.

77.     To further ensure the successful completion of the Proposed Transaction and deter other interested parties from submitting a superior offer, the Board locked up the deal by agreeing to pay a termination fee of $13,500,000 and expenses of $3,950,000.  Section 7.3(a) and (b).  The terms of the Merger Agreement essentially require that any alternative bidder agree to pay a naked premium for the right to provide National Interstate stockholders with a superior offer.

78.     These provisions cumulatively discourage bidders from making a competing bid for the Company.

### E.     The Incomplete & Materially Misleading Proxy

79.      On August 16, 2016 and September 20, 2016, National Interstate filed the Proxy with the SEC in connection with the Proposed Transaction.  The Proxy misrepresents and/or

omits material information that is necessary for the Company's stockholders to make an informed decision whether to vote in favor of the Proposed Transaction in violation of Sections 14(a) and 20(a) of the Exchange Act.  Specifically, the Proxy fails to provide the Company's stockholders with material information concerning the process leading up to the signing of the Merger Agreement and information concerning the financial analyses and work performed by Morgan Stanley.  As a result of the incomplete and misleading Proxy, National Interstate stockholders will be unable to make an informed decision concerning whether to vote for or against the Merger.

80.     The Proxy fails to provide material information concerning the process conducted by the Board and the events leading up to the signing of the Merger Agreement.  In particular, the *Background of the Merger* section contained on pages 21-33 of the Proxy is materially deficient in that it fails to disclose the following information:

(a)     The identity of the shareholders with which the Special Committee and Morgan Stanley had contact and what their views were regarding the various proposals by Great American/AFGI (Proxy 28);

(b)      The identity of the shareholders with which Great American and/or AFGI had contact and what their views were regarding the various proposals by Great American/AFGI (Proxy at 28);

(c)     The Company management's projections used by Morgan Stanley *prior* to the instruction by the Special Committee to use the 2016-2018 projections (*see* Proxy 31);

(d)     How the pending second quarter results impacted the financial analysis and why they no longer reflected material value accretion arising from the Proposed Transaction (Proxy 30);

(e)     The rationale for engaging Morgan Stanley as the Company's financial advisor, whether the Board considered and/or vetted other financial advisors, the fees Morgan Stanley has earned from prior work for National Interstate, and the reasons the Special Committee decided that Morgan Stanley was appropriate in light of the fact that Rosenthal was a former Morgan Stanley employee for 15 years;

(f)     The strategic alternatives identified by Morgan Stanley in its preliminary financial analysis presented to the Special Committee on May 26, 2016 (Proxy at 26);

(g)     The Special Committee's initial views as to potential ranges of values and AFGI's initial views on the ranges of values and underlying valuation assumptions that Morgan Stanley had communicated to Consolino (Proxy at 27);

(h)     The reasons for revising the Company's projected financial results with respect to the Proposed Transaction (Proxy at 30);

(i)     The Board's rationale for not negotiating a "go-shop" provision in the Merger Agreement;

(j)     Whether National Interstate provided Great American with its internal financial projections/measures prior to entering the Merger Agreement and whether those projections/measures were identical to the

projections/measures provided to Morgan Stanley for purposes of its fairness opinion;

(k)    All of Morgan Stanley's engagements, work performed for (and fees earned) and/or equity holdings in (i) the Company, and/or (ii) Great American (and any and all affiliates and/or subsidiaries).

81.    Further, the Proxy fails to provide any information regarding the valuation analyses that appeared in the June 2, 2016, valuation presentation prepared by Morgan Stanley and authorized by the Special Committee (the "June 2nd Presentation").   The June 2nd Presentation "contained financial analysis regarding the Merger Transaction, which included certain aspects of the Preliminary Financial Analysis and certain areas of potential additional value and synergies that the special committee had identified as potential drivers of transaction value."  Proxy at 27.  The valuations in the June 2nd Presentation suggest that the Merger Consideration does not reflect the fair value of the shares held by the Class.  While the Proxy purports to provide a summary of the "Preliminary Presentations by Morgan Stanley", Proxy at 44, it completely omits a summary of the analyses in the June 2nd Presentation.  The omission of such information renders the description of the June 2nd Presentation on page 27 of the Proxy materially incomplete and therefore misleading.

82.    The omission of the above information renders statements in the Proxy, including the summary of the background leading up to the signing of the Merger Agreement, the description and references to the Company's projections, and the statements in the Proxy that the Merger Consideration is "fair" to the Company's shareholders, false and/or materially misleading in contravention of the Exchange Act.  Absent disclosure of the foregoing material information prior to the special stockholder meeting to vote on the Proposed Transaction,

Plaintiff and the other members of the Class will be unable to make a fully-informed decision whether to exchange their shares are thus threatened with irreparable harm warranting the injunctive relief sought herein.

## COUNT I

**Class Claim Against Defendants for**
**Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9**

83.     Plaintiff repeats and realleges each allegation set forth herein.

84.     Defendants have issued the Proxy with the intention of soliciting stockholder support for the Proposed Transaction.

85.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that such communications with stockholders shall not contain "any statement which, at the time an in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

86.     Specifically, the Proxy violates Section 14(a) and Rule 14a-9 because it omits material facts as set forth above which renders the statements and information identified above false and/or misleading.  Moreover, in the exercise of reasonable care, Defendants should have known that the Proxy is materially misleading and omits material facts that are necessary to render it non-misleading.

87.     Defendants prepared and reviewed the false and misleading Proxy, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not false and/or misleading.  Defendants were obligated to review the Proxy to ensure that it was materially complete and did not contain false or misleading statements before it was disseminated to National Interstate shareholders.

88.     The misrepresentations and omissions in the Proxy are material to Plaintiff who will be deprived of his entitlement to cast a fully informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.  As a direct and proximate result of Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

89.     Plaintiff and the members of the Class have no adequate remedy at law.

## COUNT II

### Class Claim for Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

90.     Plaintiff repeats and realleges each allegation set forth herein.

91.     The Individual Defendants acted as controlling persons of National Interstate within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of the National Interstate, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends were false and/or materially incomplete and therefore misleading.

92.     Each of the Individual Defendants were provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

93.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities

violations alleged herein, and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Merger.  Thus, the Individual Defendants were intimately connected with and directly involved in the making of this document.

94.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Merger. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

95.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

96.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

97.     Plaintiff and the Class have no adequate remedy at law.

## COUNT III

### Class Claim for Violations of Section 13(e) of the Exchange Act and SEC Rule 13e-3 Against Great American, AFGI and Merger Sub

98.     Plaintiff repeats and realleges each allegation set forth herein.

99.     Because the Proposed Transaction is considered a "going private" transaction, Great American, AFGI and Merger Sub are required to express their beliefs as to the fairness of

the Proposed Transaction to Plaintiff and the Class pursuant to Rule 13e-3.  Great American, AFGI and Merger Sub have failed to fulfill their obligations, in violation of Rule 13e-3.

100.   Specifically, Item 8(b) of Schedule 13e-3 concerns the factors underlying a belief as to the fairness of the transaction.  The SEC has issued the following guidance to prospective issuers:

> The Division is concerned that in many instances the Item 8(b) disclosure being made to security holders is vague and non-specific and is therefore of limited utility to security holders. . . . Each such factor which is material to the transaction should be discussed and, in particular, *if any of the sources of value indicate a value higher than the value of the consideration offered to unaffiliated security holders, the discussion should specifically address such difference and should include a statement of the bases for the belief as to fairness in light of the difference.*

Exchange Act Release No. 34-17719, at 17, 245-42.

101.   Great American, AFGI and Merger Sub failed to comply with their obligations under this Rule.  Specifically, while Great American, AFGI and Merger Sub purported to set forth their position as to the fairness of the Proposed Transaction on page 49 of the Proxy, they simply provided certain boiler-plate language setting forth the fact that they did not undertake any independent evaluation of the fairness of the Proposed Transaction to the Company's public shareholders, but that they nevertheless believe the Proposed Transaction is "substantively fair" and "procedurally fair" to the Company's shareholders based upon certain procedures implemented during the negotiation of the Merger Agreement and based upon the Special Committee's determination that the Proposed Transaction is fair.

102.   The presentations prepared by Morgan Stanley, including the June 2nd Presentation which was specifically authorized by the Special Committee and presented to Individual Defendant Consolino, as well as the presentations dated July 24, May 19, July 1, July

8, and July 20, constitute "sources of value that indicate a value higher than the value of the consideration offered to unaffiliated security holders." Indeed, the June 2nd Presentation indicates that the Company's shares are worth as much as $45.86 per share. However, Great American, AFGI and Merger Sub failed to include any discussion that specifically addresses the difference between the Merger Consideration and the higher valuations set forth in the valuation analyses and valuation ranges arrived at by Morgan Stanley, and a statement of the bases for their belief as to the fairness of the Merger Consideration in light of the differences.

103.    Great American, AFGI and Merger Sub have therefore violated Rule 13e-3 of the Exchange Act.

104.    The omission of such information from the Proxy constitutes a material omission and deprives Plaintiff and the Class of their entitlement to cast a fully informed vote unless such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction. As a direct and proximate result of Great American, AFGI and Merger Sub's conduct, Plaintiff and the Class will be irreparably harmed.

105.    Plaintiff and the Class have no adequate remedy at law.

## COUNT IV

### Class Claim for Breach of Fiduciary Duties Against the Individual Defendants

106.    Plaintiff repeats and realleges each allegation set forth herein.

107.    The Individual Defendants have violated the fiduciary duties of care, loyalty, good faith, and independence owed to the public shareholders of National Interstate and have acted to put their personal interests ahead of the interests of National Interstate's shareholders.

108.    By the acts, transactions, and courses of conduct alleged herein, the Individual Defendants, individually and acting as a part of a common plan, are attempting to unfairly

deprive Plaintiff and the other members of the Class of the true value of their investment in National Interstate.

109. The Individual Defendants have knowingly or recklessly and in bad faith violated their fiduciary duties by entering into a transaction with Great American without regard to the fairness of the transaction to National Interstate shareholders, by failing to make adequately informed and reasonable decisions in connection with the Proposed Transaction, and by failing to disclose all material information concerning the Proposed Transaction to such shareholders.

110. As demonstrated by the allegations above, the Individual Defendants knowingly or recklessly failed to exercise the care required, and breached their duties of loyalty, good faith, candor, and independence owed to the shareholders of National Interstate because, among other reasons:

(a) They unreasonably failed to take steps to maximize the value of National Interstate to its public shareholders to cap the price of National Interstate's stock and to give Defendants an unfair advantage, by, among other things, failing to solicit other potential acquirers or alternative transactions;

(b) They failed to properly value National Interstate;

(c) They consciously disregarded their duty to provide good faith consideration to the best interests of the Company and its shareholders;

(d) They failed to make adequately informed and reasonable decisions in connection with the Proposed Transaction;

(e) They ignored or did not protect against the numerous conflicts of interest resulting from the directors' own interrelationships or connections with the Proposed Transaction; and

(f)     They failed to disclose all material information that would permit National Interstate's shareholders to cast a fully informed vote on the Proposed Transaction.

111.    Because the Individual Defendants dominate and control the business and corporate affairs of National Interstate, and have access to private, corporate information concerning National Interstate's assets, business, and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of National Interstate which makes it inherently unfair for them to pursue and recommend any transaction wherein they will reap disproportionate benefits reached through an unfair process.

112.    Unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiff and the Class, and may consummate the Proposed Transaction which will exclude the Class from its fair share of National Interstate's valuable assets and operations, and/or benefit Defendants in the unfair manner complained of herein.

113.    As a result of the Individual Defendants' unlawful actions, Plaintiff and the other members of the Class will be irreparably harmed in that they will not receive their fair portion of the value of National Interstate's assets and operations and will be prevented from obtaining fair value for their investment and they will not be able to cast an informed vote with all material information concerning the Proposed Transaction.

114.    Unless the Proposed Transaction is enjoined by the Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiff and the other members of the Class, will not engage in arm's-length negotiations on the Proposed Transaction terms, will not supply to National Interstate's shareholders sufficient information to enable them to cast informed votes on the Proposed Transaction, and may consummate the Proposed Transaction, all to the irreparable harm of Plaintiff and the members of the Class.

115.    Plaintiff and the Class have no adequate remedy at law.

## COUNT V

## Derivative Claim for Breach of Fiduciary Duties Against the Individual Defendants

116.    Plaintiff repeats and realleges each allegation set forth herein.

117.    The Individual Defendants have breached fiduciary duties of care, loyalty, candor, good faith, and independence owed to National Interstate and its public shareholders and have acted to put their personal interests ahead of the interests of the Company.

118.    By the acts, transactions, and courses of conduct alleged herein, the Individual Defendants, individually and acting as a part of a common plan, have breached their fiduciary duties by entering into the Proposed Transaction without regard to the fairness of the transaction to National Interstate and its public shareholders.

119.    As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, candor, and independence owed to National Interstate because, among other reasons:

(a)    They ignored or did not protect against the numerous conflicts of interest resulting from the material insider benefits secured in the Proposed Transaction;

(b)    They failed to conduct a full and fair sales process for National Interstate, thereby failing in their duty to properly obtain a fair price for the value of National Interstate common shares in order to secure material insider benefits for Company insiders;

(c)    They failed to fully inform themselves of the market value of National Interstate before taking, or agreeing to refrain from taking, action resulting in the sale of the Company at an unfair price to Great American;

(d)     They adopted and agreed to preclusive deal protection devices that collectively lock up the sale of the Company for the benefit of Defendants' preferred bidder, Great American without regard to the overall fairness of the Proposed Transaction; and

(e)     They failed to clearly authorize the Special Committee to conduct a market by considering other potential bidders.

120.    By reason of the foregoing acts, practices, and course of conduct, Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Associated Estates and its shareholders.

121.    As a result of Defendants' actions, the Company and its shareholders have been and will be irreparably harmed as they have no adequate remedy at law. Only through the exercise of this Court's equitable powers can the Company and its shareholders by fully protected from the immediate and irreparable injury which Defendants' actions threaten to inflict.

## COUNT VI

### Class Claim for Breach of Fiduciary Duties Against Great American as a Controlling Stockholder

122.    Plaintiff repeats and realleges each allegation set forth herein.

123.    As the controlling stockholder of the Company, Great American owes fiduciary duties of loyalty, care and good faith to National Interstate's public stockholders.

124.    Great American, via its control over approximately 51.2% of the outstanding shares of the Company's common stock, is attempting to acquire the Company on terms that are inherently unfair to the Company's public stockholders but are favorable to Great American.

125.    As a result of Great American's breaches of fiduciary duty as a controlling stockholder of the Company, Plaintiff and the other members of the Class have been and will be

damaged and suffer irreparable injury because they are prevented from receiving fair value for their shares.

126.    As a result of Great American's actions, the Company and its public shareholders have been and will be irreparably harmed as they have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can the Company and its public shareholders by fully protected from the immediate and irreparable injury which Defendants' actions threaten to inflict.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands injunctive relief in their favor and in favor of the Class and against Defendants as follows:

A.    Declaring that this action is properly maintainable as a Derivative and Class action and certifying Plaintiff as Class representatives and his counsel as Class Counsel;

B.    Declaring and decreeing that the Proposed Transaction was entered into in breach of the Individual Defendants' fiduciary duties and is therefore unlawful and unenforceable;

C.    Enjoining Defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Transaction, unless and until Defendants disclose the material information identified above which has been omitted from the Proxy;

D.    Rescinding, to the extent already implemented, the Proposed Transaction or any of the terms thereof, or granting Plaintiff and the Class rescissory damages;

E.    Directing the Individual Defendants to account to Plaintiff and the Class for all damages suffered as a result of the Individual Defendants wrongdoing;

F.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

G.      Granting such other and further equitable relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

October 07, 2016

Respectfully submitted,

**KARON LLC**

*/s/ Daniel R. Karon*
Daniel R. Karon (#0069394)
Beau D. Hollowell (#0080704)
The Hoyt Block Building, Ste. 200
700 West St. Clair Avenue
Cleveland, Ohio 44113
Phone: 216.622.1851
Fax: 216.241.8175
dkaron@karonllc.com
bhollowell@karonllc.com

**OF COUNSEL**

**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**
Gregory M. Nespole
Gloria Kui Melwani
270 Madison Avenue
New York, NY 10023
Ph. (212) 545-4600

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde
The Empire State Building
350 Fifth Avenue, 59th Floor
New York, NY 10118
Ph. (212) 971-1341
Cell (305) 205-8284 or (646) 522-4840
email: jmonteverde@monteverdelaw.com

Attorneys for Plaintiff